**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ANNIE PERRONE,

                    Plaintiff,

v.

CATAMOUNT SKI RESORT, LLC
and CATAMOUNT DEVELOPMENT
CORPORATION,

                    Defendants.

1:20-cv-563 (AMN/CFH)

_____

**APPEARANCES:**                                          **OF COUNSEL:**

**LAW OFFICE OF URIEL E. GRIBETZ**            **URIEL E. GRIBETZ, ESQ.**
19 Court Street, Suite 201
White Plains, New York 10601
*Attorneys for Plaintiff*

**ROEMER WALLENS GOLD & MINEAUX, LLP**      **MATTHEW J. KELLY, ESQ.**
13 Columbia Circle
Albany, NY 12203
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

On August 28, 2019, Annie Perrone ("Plaintiff"), commenced this diversity action against

Catamount Ski Resort, LLC ("Catamount Ski Resort") and Catamount Development Corporation

("Catamount Development"; together with Catamount Ski Resort, "Catamount" or "Defendants")

in the Southern District of New York, alleging negligence and gross negligence in connection with

injuries Plaintiff suffered while skiing at Catamount Ski Resort.  *See generally* Dkt. No. 1

("Complaint").  On September 23, 2019, Defendants filed an Answer to the Complaint.  *See* Dkt.

No. 9.  On October 31, 2019, Defendants moved to transfer venue to the Northern District of New

York, Dkt. No. 15, and on May 19, 2020, the Court granted Defendants' motion, Dkt. No. 19. Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 58 ("Motion"). Plaintiff filed an Opposition, Dkt. No. 64, and Defendants filed a Reply, Dkt. No. 65.

For the reasons set forth herein, Defendants' Motion is denied.

## II.    BACKGROUND[1]

Familiarity with the facts alleged in the Complaint is assumed, and only the facts relevant to resolving the Motion are revisited here.

Plaintiff resides in Connecticut. Dkt. No. 1 at ¶ 2. Catamount Development designed, owns, and controls Catamount Ski Resort, which is a "ski recreational facility" with its principal place of business in Hillsdale, New York. *Id*. at ¶¶ 3, 20-22.[2] Both Catamount Development and Catamount Ski Resort were "duly organized and exist[] under and by virtue of the laws of the State of New York." Dkt. No. 1 at ¶¶ 12, 14.

On March 3, 2019, Plaintiff Annie Perrone was injured while skiing downhill at Catamount. Dkt. No. 58-1 at ¶ 1. Plaintiff alleges that she collided with "an unmarked, unguarded and unpadded pole from a snowmaking machine located on the ski trail," and as a result suffered several "severe, serious, permanent and disabling" injuries, including "multiple pelvic fractures,

---

[1] Unless otherwise indicated, the following facts have been asserted by the parties in their Statements of Material Facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *Compare* Dkt. No. 58-1 (Defendants' Rule 56.1 Statement of Material Facts) *with* Dkt. No. 64-1 (Plaintiff's response); *compare* Dkt No. 64-2 (Plaintiff's Rule 56.1 Statement of Material Facts) *with* Dkt. No. 65 (Defendants' response). The Court has also considered the exhibits submitted by the parties. *See generally* Dkt. Nos. 58, 64, 65.

[2] Catamount Ski Resort is located on the border of Hillsdale, New York and South Egremont, Massachusetts. Dkt. No. 15-1 at ¶ 7. Defendants' corporate offices are located in Hillsdale, New York. *Id*. at ¶ 6.

right sacral alar/acetabular/ischium fracture, right inferior pubic rami fracture, and left pubic bone fracture." Dkt. No. 1 at ¶¶ 8-10.

At the time of the accident, Plaintiff was an eighteen-year-old student. Dkt. No. 58-16 at 5.[3]  Plaintiff testified that while she had skied in the past at Butternut Ski Area in Massachusetts and Thunder Ridge in Putnam County, New York, she did not know if she had been to Catamount before. Dkt. No. 58-7 at 46:22-25; 48:2-6; 54:15-18.  Plaintiff further testified that she had not skied in a few years, and she took a one-hour ski lesson the day of the accident.  Dkt. No. 58-7 at 47:8-9; 53:7-9, 17-18.[4]

On the day of the accident, Plaintiff was skiing on a beginner level trail called Colonel's Caper.  Dkt. No. 58-1 at ¶ 3.  The weather conditions were clear, and nothing obstructed Plaintiff's vision as she went downhill.  Dkt. No. 58-1 at ¶¶ 13, 16.  Prior to the accident, Plaintiff was skiing slightly to the left of the center of the trail, about five to ten feet in front of her father, Carlos Perrone, and behind and a little to the left of her sister, Megan Perrone.  Dkt. No. 58-1 at ¶¶ 8, 21, 29.  Plaintiff testified that about five minutes after she exited the lift, she fell and traveled some distance downhill colliding with an "uncovered" snowmachine pole ("snow gun").[5]  Dkt. No. 58-1 at ¶¶ 14, 21; Dkt. No. 58-7 at 59:13-15.  Plaintiff also testified that she knew she had an obligation

---

[3] Citations to court documents, including deposition transcripts, utilize the pagination generated by CM/ECF, the Court's electronic filing system.

[4] Plaintiff testified that while skiing was something she was familiar with and was pretty good at, it had been "a couple years" since she had last skied.  Dkt. No. 58-7 at 49:20-50:1.  Additionally, Plaintiff's father Carlos Perrone testified that it had been "three or four years" since Plaintiff had skied prior to the accident.  Dkt. No. 58-8 at 8:17-24.

[5] Defendants have not conceded that Plaintiff's injuries were caused by a collision with a snow gun.  *See, e.g.*, Dkt. No. 58-22 at 14 ("Plaintiff's fall while skiing was among the inherent risks, and her collision, *if any, with equipment, such as a snow gun* would also have been part of the inherent risks.") (emphasis added).

to ski in control, was skiing "controlled up until" she fell, did not know the cause of her fall[6] or her speed at the time of her fall, and never saw the snow gun before she collided with it.  Dkt. No. 58-1 at ¶¶ 7, 10, 12; Dkt. No. 58-7 at 59:11-15.

Both Megan Perrone and Carlos Perrone witnessed the accident.  Dkt. No. 64-2 at ¶ 3. Megan Perrone testified that she was skiing in front and to the right of Plaintiff, and at some point, "[Plaintiff] was not as close to her as when they started out and she turned … looked up and saw [Plaintiff] barrel-rolling down the side."  Dkt. No. 58-1 at ¶¶ 29-30.  Megan Perrone also testified that she saw her sister tumble on her side into the snow gun[7] which was "on the trail … but on the side of the trail."  Dkt. No. 58-1 at ¶¶ 31, 33; Dkt. No. 58-9 at 43:12-13.  Ms. Perrone further testified that she did not see a bamboo pole[8] on the slope prior to the accident.  *See* Dkt. No. 58-9 at 40:6-25.

Carlos Perrone testified that before the accident Plaintiff was not "going fast … it was more like just going [] side to side … [n]othing unusual."  Dkt. No. 58-8 at 23:13-16.  Mr. Perrone further testified that he was skiing five to ten feet behind Plaintiff and saw her fall backward onto her left side and slide five to ten feet to the left.  Dkt. No. 58-1 at ¶¶ 22-24; Dkt. No. 58-8 at 26:4-27:7.  Mr. Perrone described the accident as follows:

> [Plaintiff] seemed to lose her footing.  She fell and I don't know [the reason] …  it was icy … she fell on her [left] side … she kept going down pretty fast.  It was a pretty … angled spot where you're really falling down ….  [W]hen I saw her falling … I also saw this snowmaking thing in front of her ….  Her forward motion just brought her straight into that and … she smacked very hard into [the snow gun].

---

[6] Plaintiff testified she did not know how she fell but "[i]t was just icy in that area."  Dkt. No. 58-7 at 60:4-6.

[7] Megan Perrone also testified that she did "not know what her sister came into contact with as to whether it was the cement base, the pole or something else."  Dkt. No. 58-1 at ¶ 32.

[8] A bamboo pole, or "lollipop," is a thin pole with an orange disc affixed to the top, typically placed as a warning marker five to ten feet uphill from skiing hazards.  *See* Dkt. No. 58-1 at ¶¶ 42-43, 55, 62, 74.

Dkt. No. 58-8 at 24:22-28:9.  Mr. Perrone also testified that the snow gun with which Plaintiff collided was "on the edge of the trail" and there were no markers located on that snow gun.  Dkt. No. 58-8 at 41:1-15; 48:10-16.

Other witnesses testified to the location of the snow gun and whether it was marked by a bamboo pole.  Three Catamount ski patrollers, Thomas Carroll, William Silta, and Gerald Pollard, testified that the snow gun in question was located "off-trail," meaning on the ungroomed terrain. Dkt. No. 58-1 at ¶¶ 36, 39, 60, 65, 78.[9]  Specifically, Mr. Carroll testified that the snow gun "was at least six feet, probably more" from the groomed area, and Mr. Silta testified he "would guess [] it was at least 10 feet off the groomed surface of the trail."  *Id.* at ¶¶ 39, 65; Dkt. No. 58-12 at 56:24-57:2.  The ski patrollers also testified that the snow gun was marked with a "lollipop."  *See* Dkt. No. 58-1 at ¶¶ 40-42, 53, 61, 81.

### III.     STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  "When analyzing a summary judgment

---

[9] The ski patrollers generally referred to "off-trail" as meaning beyond the groomed surface of the trail and "on-trail" as meaning within the bounds of the groomed surface.  *See, e.g.*, Dkt. No. 58-1 at ¶ 76 (citing Dkt. No. 58-13 at 11:7-9).  Grooming is a machine process used to "even out rough spots, chop up icy spots and cover up bare spots."  *See* Dkt. No. 58-1 at ¶ 56.  Plaintiff disputes this definition of "on-trail" and "off-trail."  *See infra* n. 19.

motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendants, in seeking summary judgment, "bear[] the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [their] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted).  To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002).  A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997).  The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.   DISCUSSION

### A.  Assumption of the Risk

Defendants argue that Plaintiff's claims are barred by the assumption of the risk doctrine, citing both New York common law and the New York Safety in Skiing Code ("Code").[10] *See*

---

[10] Where "jurisdiction is based upon diversity, the court must apply the substantive law of the forum state." *Rich v. Tee Bar Corp.*, No. 1:10-CV-1371 (MAD/CFH), 2013 WL 316154, at *4 (N.D.N.Y. Jan. 28, 2013) (citing *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.

*generally* Dkt. No. 58-22. "Generally, whether the plaintiff assumed a risk by participating in a sport is a question for the jury; dismissal of the complaint is appropriate only when the proof before the court reveals no triable issue of fact." *Rich*, 2013 WL 316154, at *4 (quoting *Samuels v. High Braes Refuge, Inc.*, 8 A.D.3d 1110, 1111 (4th Dep't 2004)).

Under New York common law, "[a] person who chooses to participate in a sport or recreational activity consents to certain risks that are inherent in and arise out of the nature of the sport generally and flow from such participation." *Good v. Peak Resorts, Inc.*, No. 1:19-CV-0683 (GTS) (CFH), 2022 WL 1555238, at *22 (N.D.N.Y. May 17, 2022) (quoting *Anand v. Kapoor*, 15 N.Y.3d 946, 947 (N.Y. 2010)). A participant consents to the inherent risks of a sport when she is "aware of the risks; has an appreciation of the nature of the risks; and voluntarily assumes the risks." *Paulus*, 100 F. Supp. 3d at 297 (quoting *Morgan v. State*, 90 N.Y.2d 471, 484 (1997)). A plaintiff's awareness of the risk is "assessed against the background of [her] skill and experience." *Id.* at 298 (quoting *Morgan*, 90 N.Y.2d at 486).

In New York, the "law is clear" that "'[d]ownhill skiers assume the inherent risks of personal injury caused by, among other things, terrain, weather conditions, ice, trees[,] and manmade objects that are incidental to the provision or maintenance of a ski facility.'" *Id.* (quoting *Fabris v. Town of Thompson*, 192 A.D.2d 1045, 1046 (3d Dep't 1993)). A skier's assumption of the risk is also statutorily recognized in the Code, set forth in New York General Obligations Law

---

1994)). Because this case is a diversity action involving common law negligence claims, New York law applies. *See Paulus v. Holimont, Inc.*, 100 F. Supp. 3d 292, 297 (W.D.N.Y. 2015).

("N.Y. Gen. Oblig. Law"),[11] which addresses the duties of skiers,[12] passengers, and ski operators.

*Id*.  As to the inherent risks in downhill skiing, the Code states, in relevant part:

> [D]ownhill skiing … contains inherent risks including, but not limited to, the risks of personal injury or death or property damage, which may be caused by variations in terrain or weather conditions; surface or subsurface snow, ice, bare spots or areas of thin cover, moguls, ruts, bumps; other persons using the facilities; and rocks, forest growth, debris, branches, trees, roots, stumps or other natural objects or man-made objects that are incidental to the provision or maintenance of a ski facility in New York State.

N.Y. Gen. Oblig. Law § 18-101.  However, a downhill skier "will not be deemed to have assumed the risk if, due to a defendant's negligence, the risks were unique and resulted in a dangerous condition over and above the usual dangers inherent in the activity."  *Good*, 2022 WL 1555238, at *22 (quoting *Connor v. Tee Bar Corp*., 302 A.D.2d 729, 730 (3d Dep't 2003)).

### 1. Defendants' Duty to Pad or Mark the Snow Gun

Defendants argue that Plaintiff "willingly participat[ed]" in downhill skiing, and, as such, consented to the "commonly appreciated risks inherent in and arising out of the nature" of the sport, "including falling while on a trail, causing her to slide off the trail, and suffer injury as a result of that fall or because of striking a snow gun which was off trail."  Dkt. No. 58-22 at 5, 8 (citing *Morgan*, 90 N.Y.2d at 484).

Defendants further argue that they had no duty to pad or mark the snow gun.  As to a duty to pad, Defendants argue that regardless of whether, as a matter of fact, the snow gun was on or off the trail, there is no state law, regulation, or industry standard that would require Defendants

---

[11] N.Y. Gen. Oblig. Law § 18-107 provides that, "[u]nless otherwise specifically provided in this article, the duties of skiers, passengers, and ski operators shall be governed by common law."

[12] The Code imposes certain duties upon skiers, including to obtain education "appropriate to [their] level of ability" to reduce the risk of injury, and to "remain in constant control of speed and course at all times while skiing."  N.Y. Gen. Oblig. Law §§ 18-105, 18-106.

to pad the snow gun.[13]  *Id.* at 14-15.  As to their duty to mark the snow gun, Defendants argue that

pursuant to N.Y. Gen. Oblig. Law § 18-103,[14] they were not required to mark the snow gun because

it was both off-trail and above six feet tall, and that recently disclosed photographic evidence[15]

shows they went beyond their legal obligation because the snow gun was, in fact, marked with a

bamboo pole.  Dkt. No. 65-15 at 4.

In Opposition, Plaintiff argues that she "did not assume the risk of injury from collision

with [an] unpadded and unmarked [snow gun] located on the ski trail," and even if New York State

law, regulation, and industry practice do not require Defendants to pad and mark the snow gun,

Defendants still had a common law duty to "maintain the ski slope in a reasonably safe condition."

Dkt No. 64-13 at 9-15.  Plaintiff also asserts that Defendants failed in their common law duty to

maintain the ski slope in a reasonably safe condition because they had "actual and constructive

notice that [an] unpadded and unmarked" snow gun posed an "unreasonable risk" to beginner

skiers.[16]  *See* Dkt. No. 64-13 at 5, 8.  Accordingly, Plaintiff argues that Defendants failed in their

---

[13] Defendants argue that the Code "does not require that snow machine poles or lighting poles be padded" and it is "impractical for a ski area to pad all potential obstacles on or adjacent to a ski slope." Dkt. No. 58-22 at 14-15.

[14] N.Y. Gen. Oblig. Law § 18-103(4) provides that a ski area operator has a duty "[t]o conspicuously mark . . . the location of such man-made obstructions as, but not limited to, snow-making equipment . . . that are within the borders of the designated slope or trail, when the top of such obstruction is less than six feet above snow level."

[15] On January 12, 2023, Magistrate Judge Hummel ordered Plaintiff's counsel "to provide to defense counsel copies of any photographs that depict the conditions of the snow on the date of the accident and any metadata obtainable for those photographs." Dkt. No. 62.

[16] "Actual notice requires the plaintiff to prove that the defendants were, in fact, aware of the dangerous condition." *Albright v. Target Corp.*, No. 21CV4811 (AMD) (RML), 2023 WL 3997381, at *1 (E.D.N.Y. June 13, 2023).  Constructive notice of a condition requires that it "must be visible, apparent, and in existence for a sufficient period of time to permit the defendant to discover it and take corrective action." *Kelly v. J.C. Penney Co.*, No. 07 CIV. 1277 (JCF), 2009 WL 2177218, at *4 (S.D.N.Y. July 22, 2009).  Plaintiff contends that Defendants had "actual and constructive notice" that an unpadded and unmarked snow gun "posed a foreseeable and unreasonable risk to skiers" based on Plaintiff's expert Stan Gale's report, which opined that based

duty to use reasonable care to correct the unsafe condition or "take other suitable precautions." Dkt. No. 64-13 at 7.

In *Madsen*, an infant skiing downhill collided with an unpadded metal snow gun. *Madsen*, 165 A.D.3d 475. The plaintiff claimed that "defendants were negligent in failing to pad" the snow gun. *Id*. The First Department found that:

> [A]n individual 'will not be deemed to have assumed … unreasonably increased risks.' If, as plaintiffs maintain, the unpadded [snow gun] was located on the ski trail or in an area where skiing was permitted, then defendants could be found to have failed to maintain their property in a reasonably safe condition …. The common law applies where, as here, plaintiffs are alleging inadequate padding of defendants['] [snow gun], a condition not specifically addressed by the [Code]. On the record before us, we cannot conclude, as a matter of law, that the [snow gun] was off-trail and that the [snow gun] did not need to be padded. Thus, defendants are not entitled to summary judgment.

*Id.* (quoting *Morgan*, 90 N.Y.2d at 485).

As in *Madsen*, courts have repeatedly recognized that a defendant's duty to maintain a ski slope in a reasonably safe condition may differ depending on whether an object with which plaintiff collided is located on or off the ski trail. *See Good*, 2022 WL 1555238, at *24 ("Most crucially, however, is the dispute of material fact regarding whether Plaintiff['s downhill snowboarding] accident took place on the unloading ramp, on the trail, or off-trail …. Defendants' duties may vary if the accident occurred off-trail—a disputed fact not able to be resolved on summary judgment."); *Basilone v. Burch Hill Operations Inc*., 199 A.D.2d 779, 780 (3d Dep't 1993) ("If as plaintiff maintains … the subject post [on a split-rail fence] was located on the ski trail, defendant could be found to have failed to maintain its property in a reasonably safe

---

on his investigation, Defendants "padded and marked on-trail snowmaking machines in 2009," and a lawsuit based on a "similar accident [which] occurred in 2015" on a beginner's slope at Catamount. *See Madsen v. Catamount Ski Resort,* 165 A.D.3d 475 (1st Dep't 2018); Dkt. No. 64-2 at ¶ 8; Dkt. No. 64-13 at 5, 8.

condition."); *Fabris*, 192 A.D.2d at 1047 (denying summary judgment, finding that if the fence post plaintiff collided with "was located on the ski trail, [defendant] could be found to have failed to maintain its property in a reasonably safe condition").

As a result, courts have denied summary judgment on the issue of whether a defendant breached its duty to maintain a ski slope in a reasonably safe condition where a plaintiff has raised a question of fact as to whether he or she collided with an unpadded or unmarked hazard on a ski trail. *See, e.g.*, *Dailey v. Labrador Dev. Corp.*, 136 A.D.3d 1380, 1381 (4th Dep't 2016) (finding that denial of summary judgment was proper because plaintiff, who had collided head-first into a snow gun, "raised a triable issue of fact" by submitting an affidavit of an expert opining that "the snowmaking machine was on the ski trail and was insufficiently padded"); *Christopher v. South Slope Dev. Corp.*, 71 Misc. 3d 1220(A) at *2 (N.Y. Sup. Ct. 2020) (finding a question of fact as to whether a "row of ten crossed bamboo poles and two 'SLOW' signs were in place" at the time of plaintiff's injury due to skiing off a ridge); *Peresypa v. Jiminy Peak Mountain Resort, Inc*., 653 F. Supp. 2d 131, 140 (D. Mass 2009) (denying summary judgment because there were "factual questions regarding the actual location of the snow gun [plaintiff struck] in relation to the skiable area of the trail and whether it was adequately marked and padded").

While the parties do not dispute that the snow gun Plaintiff allegedly collided with was unpadded, *compare* Dkt. No. 58-1 at ¶ 82, *with* Dkt. No. 64-1 at ¶ 82, they dispute whether the snow gun was on or off-trail, and whether it was marked.  Ski Patrollers Carroll, Silta, and Pollard all testified, and Defendants' expert Mark Petrozzi opined, that the snow gun was off-trail and

marked by a bamboo pole.  *See* Dkt. No. 58-1 at ¶¶ 36, 39, 40-41, 47, 53, 60-61, 78, 81, 112; Dkt. No. 58-15 at 17.[17]

On the other hand, Plaintiff, Carlos Perrone, and Megan Perrone all testified that the snow gun was on the trail and that they did not see a bamboo pole marking it.  *See* Dkt. No. 58-1 at ¶¶ 26, 33; Dkt. No. 58-7 at 80:22-82:4.  Additionally, Plaintiff's expert Stan Gale opined that the snow gun was "unmarked, unguarded and unpadded on the trail and in an unsafe condition."  *See* Dkt. No. 64-5 at 9.[18]  Furthermore, Plaintiff argues that Defendants had previously employed and subsequently discontinued a practice of padding and marking snow guns including marking snow guns both "above and below" six feet tall.  Dkt. No. 64-5 at 23-30; Dkt. No. 64-13 at 14.

After reviewing the record and considering the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has raised material questions of fact as to whether the snow gun was on or off-trail[19] and whether it was adequately marked.  Accordingly, because the Court finds that there is a question of fact as to whether Defendants failed in their duty to maintain

---

[17] Bud Gardner, who was a ski patrol director at Catamount, also testified to the general practice of marking snow guns at Catamount.  *See generally* Dkt. No. 58-14.  Mr. Gardner testified that at Catamount, the snow guns are "basically off trail," and that even when a snow gun is above six feet tall, it would usually be marked because there may be additional equipment next to it that is under six feet.  Dkt. No. 58-1 at ¶¶ 89-90; Dkt. No. 58-14 at 19:17-22.

[18] Defendants assert that the later-disclosed, original digital files for two of the photographs, *see supra* n.15, clearly show the presence of at least one bamboo pole on the day and in the vicinity of the ski accident.  Dkt. No. 65-1 at ¶ 14; Dkt. No. 65-9 at H-8 and H-9.  However, the Court is unable to find, based on these photographs alone, that the bamboo pole was properly placed as a warning for the specific snow gun with which Plaintiff allegedly collided.

[19] The parties' experts also disagree as to what is considered on or off-trail.  Defendants' expert Mark Petrozzi opined that "the trail is defined as the maintained surface from 'groomed edge to groomed edge' … [a]reas that are outside of the groomed surface are considered 'off trail.'"  Dkt. No. 58-15 at 19.  Plaintiff's expert Stan Gale opined that "any portion of the ski trail that is in front of the trees and trimline demarcating the woods has always been considered on the trail, and it is skiable terrain ….  The fact that a portion of a ski trail may not be groomed does not make that portion of the trail off trail and off limits to skiers."  Dkt. No. 64-5 at 6.

the trail in a reasonably safe condition, Defendants' motion for summary judgment must be denied on this basis.[20]

### 2. Plaintiff's Skill Level and Experience

Defendants also argue that Plaintiff assumed the risk of her injuries because of Plaintiff's familiarity with skiing, pointing to Plaintiff's testimony that she skied before "pretty frequently" and classified herself as a "pretty good" skier.  Dkt. No. 58-22 at 13 (citing Dkt. No. 58-7 at 47:8; 49:20-25).   In Opposition, Plaintiff argues that Defendants mischaracterize her skill level, and as a "beginner/intermediate skier, who was not familiar with the trails at Catamount, it cannot be determined as a matter of law" that she assumed the risk of her injury.  Dkt. No. 64-13 at 12-13.

In considering whether a plaintiff assumed the risk of her skiing injury, courts have considered a plaintiff's level of experience and familiarity with the ski trail.  *See, e.g.*, *Paulus*, 100 F. Supp. 3d at 298 ("Also relevant to the summary judgment analysis is the skier's knowledge of the risk, in part based upon the skier's familiarity with the conditions of the mountain and the skier's expertise and experience."); *Sharrow v. New York State Olympic Reg'l Dev. Auth.*, 193 Misc.2d 20 at 42 (N.Y. Ct. Cl. 2002) ("experience and skill of the skier ... are relevant factors in determining the risks assumed") (citations omitted).

New York courts have frequently found a material question of fact as to whether a skier assumed the risk of injury when she was a beginner skier who was unfamiliar with the ski trail. *See, e.g.*, *Delacy v. Catamount Dev. Corp.*, 302 A.D.2d 735, 736 (3d Dep't 2003) (finding a

---

[20] Defendants argue that Mr. Gale's photographic evidence that Catamount had a practice of padding snow guns in 2009 only shows two of over thirty trails at Catamount, both of which "were being used for racing activities on the day of his inspection."  Dkt. No. at 65 at ¶ 5; Dkt. No. 65-1 at ¶¶ 5-6.  There is a question of fact as to whether Defendants previously had a practice of padding snow guns, especially in light of ski patroller Stacy Langa's December 20, 2016 testimony in the *Madsen* case that snow guns were padded at Catamount in the past.  Dkt. No. 64-2 at ¶¶ 9-10 (citing Dkt. No. 64-11 at 33:6-35:9, 36:7-13).

material question of fact as to whether "a seven-year-old novice skier, fully appreciated the risks … required for a finding that she had assumed the risk of her injuries"); *Sytner v. State*, 223 A.D.2d 140, 144 (3d Dep't 1996) (finding that, even though icy patches are generally an inherent risk of skiing, a beginner skier did not assume the risk of a particular icy patch located on a "novice trail" because of evidence that the conditions "constituted a hazardous condition for novice skiers"); *Roberts by Ladd v. Ski Roundtop, Inc*., 212 A.D.2d 768, 768-69 (2d Dep't 1995) (finding the trial court properly denied summary judgment regarding assumption of the risk where an inexperienced skier fell after hitting a dirt patch and suffered injury).

Defendants cite to several cases where New York courts have granted summary judgment based on a skier's assumption of the risk. *See* Dkt. No. 58-22 at 8-13. However, those cases are inapposite because the plaintiffs self-identified as intermediate or expert level skiers, and the accidents took place on non-beginner trails. *See Hyland v. State of New York*, 300 A.D.2d 794, 794-95 (3d Dep't 2002) (finding that a skier with over twenty years of skiing experience, assumed the risk of injury when colliding with a fence on an expert trail); *Painter v. Peek'N Peak Recreation, Inc.*, 2 A.D.3d 1289, 1290 (4th Dep't 2003) (finding that a skier with "nearly sixty years" of experience who had skied the slope on which he was injured "hundreds of times" assumed the inherent risks of subsurface ice); *Bono v. Hunter Mountain Ski Bowl, Inc*., 269 A.D.2d 482, 482-83 (2d Dep't 2000) (finding that decedent, an expert skier who struck an ice patch and fell on an expert trail, assumed the risks of his accident); *Ruepp v. West Experience*, 272 A.D.2d 673, 673-74 (3d Dep't 2000) (finding that an intermediate level "regular" skier who had skied at the defendant's facility "six [to] eight times" that season, assumed the risks of downhill skiing at night).

Here, even though Plaintiff testified that she had skied "pretty frequently," Plaintiff also testified that she "felt the need to take a lesson prior to skiing the regular slopes because she had not skied in a couple of years," and she "would not classify herself as any level skier." Dkt. No. 64-13 at 12 (citing Dkt. No. 58-7 at 47:5-9; 49:16-50:1; 53:7-54:4). Carlos Perrone testified that Plaintiff's skill was somewhere "between beginner and intermediate." Dkt. No. 58-8 at 9:16-21. Additionally, Defendants' expert opined that it was Plaintiff's "first run of the day when she was injured, (other than taking a lesson in the teaching area at the base of the mountain)" and because it was her "first run in several years … she would have been entirely unfamiliar with the general configuration and layout of the trail and the surrounding natural and man-made objects, both on and off the trail, as well as the prevailing snow conditions." Dkt. No. 58-15 at 11.

Plaintiff is entitled to every favorable inference. *See Basilone*, 199 A.D.2d at 780. Accordingly, from the evidence presented as to Plaintiff's experience and familiarity with the ski trail, the Court cannot conclude as a matter of law that Plaintiff assumed the risk of her injuries.

### 3. Plaintiff's Duty Under the Code

Defendants also argue that the Code required Plaintiff to familiarize herself with the inherent risks of skiing, which include avoiding a collision with a snow gun,[21] and "maintain[ing] control of her speed and course at all times." Dkt. No. 58-22 at 7-8, 14 (citing N.Y. Gen. Oblig. Law §§ 18-105, 18-106).[22] Defendants contend that Plaintiff was informed of these obligations

---

[21] Defendants argue that Plaintiff's fall and subsequent collision with a snow gun while skiing is an "inherent risk" because a snow gun "is a man-made object that is incidental to the provision or maintenance of a ski facility." Dkt. No. 58-22 at 14 (citing N.Y. Gen. Oblig. Law § 18-101).

[22] N.Y. Gen. Oblig. Law § 18-105 places certain duties upon skiers including "[n]ot to ski beyond their limits or ability to overcome variations in slope, trail configuration and surface or subsurface conditions which may be caused or altered by weather, slope or trail maintenance work by the ski area operator, or skier use," and to "remain in constant control of speed and course at all times while skiing so as to avoid contact with plainly visible or clearly marked obstacles and with other skiers and passengers on surface operating tramways." Additionally, N.Y. Gen. Oblig. Law § 18-

by her lift ticket which contained information regarding assumption of risk and a direction to review the requirements of the Code.[23] *Id.* at 13.  Defendants' expert also opined that "the evidence is that [] plaintiff chose to ski at a speed that was too fast for her ability, the terrain, and/or the conditions which she alleged were 'icy.'"  Dkt. No. 58-15 at 12.

On the other hand, Carlos Perrone testified that Plaintiff was "not [skiing] very fast" before the accident.  Dkt. No. 58-8 at 23:13-16.  Plaintiff also testified that she knew she had an obligation to ski in control and was skiing "controlled up until [she] fell … and then came into impact with the uncovered" snow gun.  Dkt. No. 58-1 at ¶ 12; Dkt. No. 58-7 at 59:11-15; 82:15-19.

Courts have denied summary judgment when there is a question of fact as to whether a person was skiing in control or beyond their ability when an accident happened.  *See Good*, 2022 WL 1555238, at *23 (denying summary judgment when a question of fact remained regarding whether plaintiff was in "constant control of speed and course at all times" while snowboarding, when she hit an ice groove adjacent to a fence and fell); *see also Rigano v. Coram Bus Serv., Inc.*, 226 A.D.2d 274, 275 (1st Dep't 1996) (finding a material issue of fact as to "whether the decedent was skiing out of control and beyond his ability").

Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court finds a material issue of fact as to whether Plaintiff was skiing in control before the accident.  Therefore, Defendants' Motion must be denied on this basis as well.

---

106 requires skiers to "obtain such education in the sport of skiing as the individual skier shall deem appropriate to his or her level of ability, including the familiarization with skills and duties necessary to reduce the risk of injury in such sport."  Finally, the New York Administrative Code, 12 NYCRR § 54.4, requires skiers to "be in constant control of speed and course at all times so as to avoid contact with plainly visible or clearly marked obstacles."

[23] Plaintiff was skiing on a single session RFID card "lift ticket," which was an electronic ticket containing information on the risks of skiing in addition to a directive to review the Responsibility Code.  Dkt. No. 58-22 at 13 (citing Dkt. No. 58-15 at 10-11, 12-13).

## B. Proximate Cause of Plaintiff's Injuries

Defendants argue that even if they failed to adequately pad the snow gun, the lack of padding was not the proximate cause of Plaintiff's injuries. *See* Dkt. No. 65-15 at 5. Defendants' expert Irving Scher, a biomechanical engineer, opined that typical ski area padding "used on off-trail objects" would have been unlikely to prevent the pelvic injury Plaintiff suffered "at or near typical non-beginner skier speeds on a trail similar to Colonel's Caper." *See* Dkt. No. 58-1 at ¶¶ 114-121 (citing Dkt. No. 58-16 at 21, 25). In Opposition, Plaintiff's expert, Mr. Gale, opined that "allowing this snowmaking device to be unguarded, unmarked and unpadded within the ski trail was a substantial factor and proximate cause of Plaintiff's injuries." Dkt. No. 64-2 at ¶ 4 (citing Dkt. No. 64-5 at 9, 32-33). Plaintiff further argues that Dr. Scher is not a physician, and therefore is not qualified to testify regarding "plaintiff's injuries and mechanism of injury." Dkt. No. 64-13 at 8-9. At the very least, Plaintiff asserts that a jury "should be allowed to evaluate the credibility of [Dr.] Scher's assertion that Plaintiff would have suffered the same injuries whether the [snow gun] was padded or not."[24] *Id.*

For Plaintiff to prevail on her negligence or gross negligence claim under New York law, she must establish that "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff's injuries were proximately caused by the defendant's

---

[24] Plaintiff raised the argument in its Opposition and not by Motion as to whether Dr. Scher is qualified to give expert testimony regarding Plaintiff's injuries and mechanism of injury. *See* Dkt. No. 64-13 at 8; *see also Jeffery v. Queen City Foods, LLC*, 197 A.D.3d 946, 947 (4th Dep't 2021) ("It is well settled … that biomechanical experts are not qualified to render opinions regarding injury causation."). Defendants counter that biomechanical engineers are frequently allowed to testify regarding the mechanism of injury and proximate cause. *See* Dkt. No. 65-15 at 4-6; *see also, e.g., Vargas v. Sabri*, 115 A.D.3d 505, 505 (1st Dep't 2014) (finding that a biomechanical engineer's "stated education, background, experience, and areas of specialty, rendered him able to testify as to the mechanics of injury").

breach." *Paulus*, 100 F. Supp. 3d at 297 (citation omitted); *see also Matter of Schoharie Limousine Crash of Oct. 6, 2018*, 71 Misc. 3d 934, 945 (N.Y. Sup. Ct. 2021) (noting that the same elements apply for "gross negligence").

"As a general rule, issues of proximate cause are for the trier of fact." *Miller v. Holiday Valley, Inc.*, 85 A.D.3d 1706, 1708 (4th Dep't 2011) (quoting *Bucklaew v. Walters*, 75 A.D.3d 1140, 1142 (4th Dep't 2010)).  Courts have denied summary judgment where there is a question of fact as to whether defendant's alleged negligence caused or enhanced plaintiff's injury.  *See, e.g.*, *Madsen*, 165 A.D.3d at 475 (finding that defendants were not "entitled to summary judgment on the ground that the failure to pad the pole did not cause the subject collision, because that failure may have caused or enhanced the infant's injuries").  Courts have also denied summary judgment when there is conflicting expert testimony as to the proximate cause of a plaintiff's injury.  *See Rich*, 2013 WL 316154, at *7 (denying summary judgment because there were conflicting expert reports as to whether "being 'flung' down the hill [in a snow tube] in the manner plaintiff described, was [] the proximate cause of the accident").

For the reasons set forth above, Plaintiff has presented evidence sufficient to create a question of fact as to whether Defendants' alleged negligence proximately caused her injuries.  Moreover, assuming without deciding that Dr. Scher's testimony meets the requirements of Fed. R. Evid. 702, the Court agrees with Plaintiff that the jury should be allowed to evaluate the credibility of Dr. Scher's testimony.[25]  *See* Dkt. No. 64-13 at 8-9; *see also Rich*, 2013 WL 316154,

---

[25] In addition, Plaintiff has retained a physician who she states will testify at trial as to the cause of Plaintiff's injuries.  Dkt. No. 64-1 at ¶ 113.  Plaintiff has also asserted that Mr. Gale will testify, if necessary, as to his opinion "concerning the causal connection between the subject accident, Plaintiff's injuries, and the lack thereof of proper safety policies and procedures present at the time of the accident."  Dkt. No. 58-6 at 34-36.

at *8 ("The conflicting opinions and statements of both parties' experts on material factual issues ... can only be determined by a trial on the merits …. The jury must make a determination regarding the credibility of all expert witnesses.") (quotations and citations omitted); *Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment."). Accordingly, the Court denies Defendants' motion for summary judgment on this basis.

## V.   CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' Motion for Summary Judgment, Dkt. No. 58, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  July 18, 2023
       Albany, New York

Anne M. Nardacci
U.S. District Judge

19